IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DANIEL BOSTIC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:22-CV-158-RP |
| | § | |
| THE DAILY DOT, LLC, CLARION MEDIA | § | |
| GROUP, LLC, and ZACHARY PETRIZZO | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendants the Daily Doty, LLC's ("Daily Dot") and Zachary Petrizzo's ("Petrizzo") (collectively the "Daily Dot Defendants") Motion to Dismiss, (Dkt. 9), and Motion for Judicial Notice, (Dkt. 10), and Defendant Clarion Media Group, LLC's ("Clarion Media") Motion to Dismiss, (Dkt. 12).[1] Having considered the parties' briefs, the record, and the relevant law, the Court will grant Clarion Media's motion and deny the Daily Dot Defendants' motion. Because the request for judicial notice would not change the Court's analysis, the Court will deny the motion as moot.

## I. BACKGROUND

This case revolves around an article ("the Article") published on February 23, 2021, by the Daily Dot—a wholly owned subsidiary of Clarion Media—which stated that Plaintiff Daniel Bostic ("Bostic") was a "Jan. 6 Capitol riot organizer." (Am. Compl., Dkt. 5, at 2; Article, Dkt. 5-1). Bostic claims that he "was not connected in any way with the January 6 riots, much less that he was an organizer or coordinator of riots and insurrection." (*Id.* at 3). According to his complaint,

---

[1] In April 2022, Clarion Media changed its name to "Fragment Media." (Mot. Dismiss, Dkt. 12, at 1 n.1). To avoid confusion, and because it was named Clarion Media at time of the complaint, the Court will continue to refer to the company as Clarion Media.

Defendants knew or disregarded that Bostic was not connected with the January 6 riot and falsely attempted to portray him as an organizer by using a photo of him at an event from a different rally in November 2020. (*Id.*).

Bostic has a background in politics but maintains that he has never been substantially involved in any attempts to overturn the 2020 election. He first interned for and later worked as a staff assistant for Congressman Tim Scott, and in 2018, volunteered with the organization "Stop the Steal," which protested ongoing recounts in Broward County, Florida. (*Id.* at 5). After 2018, he maintained contact with the organizers of Stop the Steal but began to focus on promoting his filmmaking. (*Id.*). He attended political rallies in 2020, including some following the November election results, but alleges that he did not play any part in organizing the Stop the Steal rallies planned for January 5 or 6, 2021. (*Id.*). While Bostic does not firmly deny that Stop the Steal helped to organize parts of the January 6 protest, he says that the organization did not plan the march on the Capitol or rally at then-President Trump's speech. (*Id.* at 5–6).

While Bostic acknowledges that he was at a protest in Washington D.C. on January 6, he maintains that he only attended a peaceful portion of the protest. (*Id.*). Bostic walked from the White House Ellipse to the media area of the Capitol Lawn and live-streamed a portion of the walk on Twitter via Periscope with "Stop the Steal" chants in the background. (*Id.*). He captioned one of the videos "Storming the Capitol#StopTheSteal" but argues that he was so far away from the Capitol building that it should have been obvious that he was not actually storming anything. (*Id.* at 6–7). When he reached the Capitol, Bostic saw the violent scene unfolding, deleted his Periscope stream, and left the protest. (*Id.* at 7). According to Bostic, that was the extent of his participation in the events of January 6.

On January 19, 2021, Salon published an article stating that Bostic could be seen on video climbing the steps of the Capitol building. (*Id.* at 9 (referencing Roger Sollenberger, *How two friends'*

*farcical, failed schemes ended with the biggest fail of all: Stop the Steal*, Salon, (Jan. 19, 2021), available at

https://www.salon.com/2021/01/19/how-two-friends-farcical-failed-schemes-ended-with-the-

biggest-fail-of-all-stop-the-steal) (hereinafter "Salon article"))). On February 23, 2021, the Daily

Dot—an online news organization based out of Austin, Texas—published a short article stating that

Bostic would be attending an upcoming Conservative Political Action Conference ("CPAC"). (*Id.* at

8 (citing Zachary Petrizzo, *Jan. 6 'Stop the Steal' organizer says he will be attending CPAC*, The Daily Dot,

(Feb. 23, 2021), available at https://www.dailydot.com/debug/daniel-bostic-cpac-stop-the-steal))).

The Article was written by Petrizzo, who Bostic describes as an investigative reporter who has

published for the Daily Doty, Mediaite, Salon, and the Daily Beast. (*Id.*).

According to Bostic, the article contained several defamatory statements and inferences.

First, Bostic claims that the title accusing him of being a "Jan. 6 'Stop the Steal' organizer" is false

because Stop the Steal did not plan the January 6 riot. (*Id.* at 8–10). The article contained a photo of

Bostic addressing a rally on November 12, 2020, allegedly taken from a C-SPAN video of the

protest. (*Id.*). The article had no indication that the photo was from 2020, and not the January 6,

2021 rally that the article focused on. (*Id.*). The Daily Dot article "repeated the false reporting of

Salon.com that [Bostic] can be seen on video climbing the steps of the Capitol building on January

6." (*Id.* at 9). Finally, the article refers to Bostic as having "grifted in conservative circles for over a

decade." (Daily Dot Article, Dkt. 5-1, at 3).

According to Bostic, Petrizzo continued to demonstrate a pattern of actual malice towards

Bostic following the article's publication. In February 2021, Bostic "personally contacted organizers

of CPAC 2021" to attempt to get Bostic banned from the event by continuing to spread the false

allegation that Bostic organized the January 6 riot. (*Id.* at 9–10). On June 30, 2021, Petrizzo allegedly

purchased a ticket for a private screening of Bostic's documentary but was asked to leave. (*Id.* at 10).

3

Finally, Bostic published another article on Juny 2, 2021, again describing Bostic as a "Jan. 6 'Stop the Steal' organizer." (*Id.*).

Bostic filed his complaint on February 22, 2022 against the Daily Dot, Petrizzo, and Clarion Media alleging defamation and defamation per se. (Compl., Dkt. 1). On April 20, Bostic amended his complaint to add a claim for tortious interference with contract and prospective contract relations. (Am. Compl., Dkt. 5). He alleges that Petrizzo, the Daily Dot, and Clarion Media published their article either knowingly or in blatant disregard of the substantial likelihood of harm to Bostic. He seeks damages in excess of $15,000,000.00 for the defamation. He further alleges that Petrizzo's contact with the CPAC organizers eventually led to Bostic being disinvited, which prevented him from being featured at the conference and left him unable to boost his film before fellow conservative activists. (*Id.* at 12–14).

The Daily Dot Defendants filed a motion to dismiss Bostic's amended complaint on July 1, 2022. (Mot. Dismiss, Dkt. 9). In their motion, the Daily Dot Defendants suggest that Bostic exaggerated the article's claims. (*Id.* at 9–12). They argue that there is no language or reasonable inference in the article which suggests Bostic coordinated or engaged in violent activity. (*Id.*). They further argue that their statement about Bostic "climbing the Capitol steps" cannot be defamatory because it was merely quoting (and linking to) the language of the Salon article. (*Id.*). Next, the Daily Dot Defendants argue that their description of Bostic as an organizer of the riot is not actionable in defamation because it cannot be readily interpreted as a true or false fact. (*Id.* at 17–20).

In addition, the Daily Dot Defendants argue that Bostic is a limited-purpose public figure, and as such, has not pled facts which show the Defendants acted with actual malice. (*Id.* at 21–24). In support, the Daily Dot Defendants filed a motion requesting that the Court take judicial notice of several exhibits, including webpages and social media posts by Bostic, broadcast footage of Bostic, the Salon article about Bostic, tweets from his Twitter account, a November 5, 2020 Daily Dot

article about the emergence of the "Stop the Steal" movement, the Stop the Steal statement of organization 2020, a video interview with Bostic, and a press release identifying Bostic as the media contact for the Stop the Steal group. (Mot. Jud. Notice, Dkt. 10, at 1–2).

Defendant Clarion Media filed a separate motion to dismiss on the same day. (Mot. Dismiss, Dkt. 12). Its motion focuses on the fact that Bostic alleges facts only towards the Daily Dot and Petrizzo, not towards Clarion Media. (*Id.* at 2). Clarion Media argues that Bostic does not allege conduct which would allow Clarion Media to be held liable for the torts of its subsidiary, the Daily Dot. (*Id.*). Clarion Media also incorporates the arguments made by the Daily Dot Defendants that Bostic does not state a plausible claim under state and federal law. (*Id.* at 3).

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiffs'] grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to

legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

The Court will first address whether Bostic may hold Clarion Media liable for the acts of its subsidiaries. Next, the Court will turn to Petrizzo's and the Daily Dot's request for judicial notice. Finally, the Court will address the merits of Petrizzo's and the Daily Dot's motion to dismiss.

### A.  Clarion Media's Motion to Dismiss

Clarion Media moves to dismiss Bostic's complaint because it does not allege any wrongdoing by Clarion Media specifically and does not state any facts which could hold the corporation liable for the acts of its subsidiary. (Mot. Dismiss, Dkt. 12). As to the first prong, Bostic does not dispute that Clarion Media, as the Daily Dot's parent company, played any role in publishing the Article. (Pl.'s Resp., Dkt. 22, at 1). Instead, Bostic argues that the "alter ego" doctrine applies because the Daily Dot is a mere conduit for Clarion Media. (*Id.* at 1–2).

"[A]bsent a showing of wrongdoing on the part of the parent corporation, Texas courts have refused to make the parent liable for its subsidiary's torts." *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 739 (Tex. App. 1998). Under Texas law, "Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to

avoid liability, to avoid the effect of a statute, or in other exceptional circumstances." *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984). One such exceptional circumstance is the alter ego doctrine, which allows courts to impose liability "on a corporation for the acts of another corporation when the subject corporation is organized or operated as a mere tool or business conduit." *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 593 (5th Cir. 1999) (internal citations omitted). However, "[t]here must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the alter ego of the parent and make the parent liable for the subsidiary's tort." *Lucas*, 696 S.W.2d at 374. A court generally holds the parent corporation liable only when failure to do so would result in injustice. *See id.*; *Gardemal*, 186 F.3d at 593; *Torregrossa v. Szelc*, 603 S.W.2d 803, 804 (Tex. 1980).

In support of the notion that the Daily Dot is a mere conduit for Clarion Media, Bostic alleges that "Daily Dot's link to job listings goes directly to the Fragment Media Group website" and "upon attempting to serve Daily Dot at its listed Registered Agent address, there was no answer at the door upon multiple attempts." (Pl.'s Resp., Dkt. 22, at 2–3). However, the alter ego allegation is entirely missing from Bostic's amended complaint. (*See* Am. Compl., Dkt. 5). Because Bostic does not allege the alter ego or conduit claim in his complaint, he cannot raise them for the first time in his response. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999) ("We may not look beyond the pleadings.").

Indeed, because Bostic does not make an alter ego allegation in his complaint, the parties' briefing contains almost no facts that a Texas court would typically consider in making such a determination. For example, there is no evidence on the size of subsidiary, Daily Dot, any blending of activities, or undercapitalization. *See United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 691–92 (5th Cir. 1985) (discussing the elements of an alter ego determination). Bostic argues that this inquiry requires discovery, but the mere fact that discovery will provide relevant evidence does not absolve a

plaintiff of their obligation to allege facts which plausibly suggest the truth of their claims. *Iqbal*, 556 U.S. at 678.

Even if Bostic did properly allege the alter ego claim in his complaint, Clarion Media would still be entitled to dismissal based on the limited facts that are presented. Bostic does not allege that the Daily Dot is "underfunded or undercapitalized." *Gardemal*, 186 F.3d at 593. Beyond his allegation that Daily Dot job openings are labeled as Clarion Media employees, Bostic does not allege any blending of the two corporate identities. (Pl.'s Resp., Dkt. 22; Def.'s Reply, Dkt. 25, at 2). *See also* YETI Coolers, LLC v. RTIC Coolers, LLC, No. 1:15-CV-00597-RP, 2016 U.S. Dist. LEXIS 186670, at *32 (W.D. Tex. Aug. 1, 2016) (dismissing claim because complaint "does not contain facts sufficient to allege that the corporate veil should be pierced."). In short, what limited evidence is before the Court does not suggest any facts that lean in favor of piercing the corporate veil. Accordingly, the Court will dismiss the claims against Clarion Media without prejudice.

### B. The Daily Dot Defendants' Motion to Dismiss

Having dismissed Clarion Media, the Court turns to the Daily Dot Defendants' motion to dismiss under Rule 12(b)(6). (Dkt. 9). Because Bostic alleges that he played no role in organizing the January 6 riot, the Court finds that there is a limited but sufficient factual basis to suggest that the Article was defamatory.

#### 1. Whether Bostic is a Limited-Purpose Public Figure

In defamation cases, "the question of public figure status is pervasive, and it should be answered as soon as possible." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721 (5th Cir. 1980). If the plaintiff in a defamation case is a public figure, then they must show the defamatory statements were made with "actual malice—that is, with knowledge that it waws false or with reckless disregard of whether it was false or not." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 328 (1974) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)). The Supreme Court has articulated two types of

public figures: general-purpose and limited-purpose public figures. *Trotter v. Jack Anderson Enterprises, Inc.*, 818 F.2d 431, 433 (5th Cir. 1987) (citing *Gertz*, 418 U.S. at 351). Neither party contends that Bostic is a general-purpose public figure (notwithstanding the claim that Bostic is a former "aspiring actor and model.") (Mot. Dismiss, Dkt. 9, at 7). Instead, the Daily Dot Defendants argue that Bostic's activities render him a limited-purpose public figure.

"Whether an individual is a public figure is a matter of law for the court to decide." *Trotter*, 818 F.2d at 433. The Fifth Circuit has adopted a three-part test for determining a limited-purpose public figure, holding that: "(1) The controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy." *Id.* at 433–34; *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998) (adopting same).

Here, the first and third elements are plainly met. While the parties contest exactly what the public "controversy" is, they do not dispute that Bostic has been involved in efforts to question the legitimacy of national elections in 2018 and 2020. (*See* Am. Compl., Dkt. 5; Mot. Dismiss, Dkt. 9). Regardless of which precise controversy is "at issue," it is self-explanatory that the validity of a national election is a matter of great public concern. Similarly, the alleged defamation is germane to Bostic's participation in the controversy. The allegedly defamatory statements turn principally on the scope of Bostic's activities on January 6, which are germane to Bostic's role in Stop the Steal, speaking out on election controversies, and broadcasting his own attendance at parts of the January 6 events.

As to the second prong, the Court finds that Bostic has been more than "tangentially" involved in speaking out about election controversies. In examining the size of a person's role in a

controversy, Texas courts have looked to (1) whether the plaintiff actually sought publicity surrounding the controversy, (2) whether the plaintiff had access to the media, and (3) whether the plaintiff voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation.[2] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 572–73 (Tex. 1998).

Here, based on the facts alleged in his amended complaint, the Court finds that Bostic met all three elements by choosing to inject himself into the public controversy surrounding the 2020 election and later efforts to subvert its results. Bostic describes himself as a "producer and documentary filmmaker." (Am. Compl., Dkt. 5, at 5). In his first complaint, Bostic states that the film is called "The Plot Against the President" which examines "the Russia Collusion narrative that was used against President Trump . . . . ." (Compl., Dkt. 1, at 6). Prior to the Daily Dot's article, Bostic "had an agreement to attend CPAC 2021 . . . as a means of promoting the documentary film he helped produce. As one of the film's producers, [Bostic] would have had access to backstage and VIP-only areas of the conference." (Am. Compl., Dkt. 5, at 12). His first complaint alleges that Bostic "helped found an organization called Stop the Steal, which was created to call attention to and protest what it believed to be fraudulent vote recounts going on in Broward County, Florida." (Compl., Dkt. 1, at 5). He also states that he "is active on Twitter with a relatively large number of users that follow his account (approximately 56,100 as of this filing)." (*Id.* at 5–6). His tweets include "support for election integrity." (*Id.*). He live-streamed his attendance at protests on January 6 on his Twitter and captioned the video with the hashtag #StopTheSteal. (Am. Compl., Dkt. 5, at 6).

---

[2] Courts have placed particular emphasis on whether the plaintiff extensively participated in the public controversy. *See Gertz*, 418 U.S. at 352 ("It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation."); *Immanuel v. Cable News Network, Inc.*, No. CV H-22-2031, 2022 WL 3030290 (S.D. Tex. Aug. 1, 2022) ("[O]nce Dr. Immanuel injected herself into the public debate over medical treatments for COVID, she became a limited purpose public figure whose background and credibility were legitimate subjects of inquiry.").

The Daily Dot Defendants include much more evidence supporting Bostic's status as a limited-purpose public figure. (*See* Mot. Jud. Notice, Dkt. 10). But the Court does not need to reach the admissibility of these pieces of evidence because Bostic's own allegations show that he is a limited-purpose public figure. He has actively sought publicity surrounding the controversy—he himself admits that he produced and promoted a film surrounding doubts about the 2016 election. *WFAA*, 978 S.W.2d at 573. While Bostic did not have access to traditional media as the Texas Supreme Court would have understood it its 1998 *WFAA* decision, he did utilize available media means—such as Periscope and Twitter—to broadcast to a public audience of more than 50,000 followers. (*See id.*; Compl., Dkt. 1, at 5–6). Finally, Bostic chose to undertake these activities himself—he was not forced to speak about the election by others.

In short, Bostic meets the three elements discussed in *WFAA*, and the Court finds that he played more than a trivial role in a public controversy. *WFAA*, 978 S.W.2d at 573. He has voluntarily and deliberately injected himself into the public spotlight regarding the election with the goal of influencing public discourse. Moreover, his role far exceeds that of a private individual. Bostic was not discussing election integrity with only friends and family. He was actively promoting documentaries at a major conservative news conference and posting about his activities to what he himself describes as a "relatively large number" of Twitter followers. (Compl., Dkt. 1, at 5–6). "Limited-purpose public figures are those persons who 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" *Einhorn v. LaChance*, 823 S.W.2d 405 (Tex. App. 1992) (quoting *Gertz*, 418 U.S. at 345). Bostic has repeatedly thrust himself into public debate in order to influence how people view the legitimacy of national elections. Under First Amendment and Texas law, these activities render him a limited-purpose public figure.

In response, Bostic argues that the public figure doctrine is outdated. (*See* Def.'s Resp., Dkt. 20, at 21–22). But Bostic does not explain why cases from the 1970s are inapplicable here, nor how the advent of social media should somehow moot the doctrine. Bostic next relies on a case from the Eastern District of Texas that declined to treat a plaintiff as a limited-purpose public figure where his communications of the relevant controversy were limited. (*Id.* (citing *Butowsky v. Folkenflik*, No. 4:18-cv-442, 2019 WL 3712026, at *18 (E.D. Tex. Aug. 7, 2019)). *Butowsky* is inapplicable here because the magistrate judge did not definitively rule on the limited-purpose public figure, but noted simply that it should be deferred to summary judgment. *Butowsky v. Folkenflik*, No. 4:18CV442, 2019 WL 2518833 (E.D. Tex. Apr. 17, 2019), *report and recommendation adopted*, No. 4:18CV442, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019). It does not, as Bostic argues, stand for the proposition that appearing on national media outlets is insufficient to support public figure status.

Bostic next argues that he "was not involved with the relevant controversy" as a public figure because "he did not organize or coordinate the violent attack on the United States Capitol. He did not participate in the violent attack on the United States Capitol." (Def.'s Resp., Dkt. 20, at 22–23). Here, Bostic focuses only on the attack on the Capitol as the controversy at issue. This understanding of the controversy is too narrow.[3] In *WFAA*, the Texas Supreme Court has rejected the idea that a controversy at issue should be limited to the defamatory actions alleged. 928 S.W.2d at 573. In that case, the Court held that the public controversy was not the plaintiff's ethical character, but the broader story which had made the news (in that case, specifically, the failed

---

[3] On a theoretical level, it makes little sense to draw the public controversy so narrowly. Here, Bostic argues that he did not actually organize the January 6 riot, and therefore did not have a role in the controversy that makes him a public figure. By definition, defamation involves an allegation that a plaintiff did something which they did not actually do. If the controversy is drawn as the action which plaintiff did *not* take, then the plaintiff will never be involved in the controversy. Such a holding would contravene the point of the public figure doctrine, which is to allow breathing room for discussion on issues (or people) of public concern.

Branch Davidian raid). *Id.* at 572. Similarly, here, the controversy is not just the violent portion of the January 6 insurrection, but the general efforts to undermine the election.

Bostic made repeated efforts to influence the 2018 and 2020 election recounts and certification. His status as a limited-purpose public figure extends to efforts to question the integrity of these elections. The Article itself alleges various activities, including Bostic's involvement with Stop the Steal, his attendance at CPAC, his Tweets criticizing those who labeled the January 6 riot a "coup," (Article, Dkt. 5-1). The controversy was not just Bostic's attendance at the January 6 riot, but his efforts more generally to question election integrity. Accordingly, the Court finds that Bostic's pleadings show that he is a limited-purpose public figure regarding protests of the 2018 and 2020 elections.

### 2.  Whether the Allegations are Defamatory

Having established that he is a limited-purpose public figure, Bostic must plead facts which plausibly suggest that the Daily Dot Defendants made their statements with actual malice. Because this case is still at the pleadings stage, Bostic need only allege facts which plausibly suggest the Daily Dot Defendants published the Article with knowledge that it was false or with reckless disregard of whether it was false or not. *Gertz*, 418 U.S. at 328; *Twombly*, 550 U.S. at 570. Here, the Court finds that Bostic has plausibly pled that the descriptions of him as a Jan. 6 Capitol riot organizer and coordinator of the insurrection were defamatory with the requisite level of falsity.

In total, Bostic points to five parts of the Article that are defamatory: (1) the title that labels him a "Jan. 6 'Stop the Steal' organizer," (2) the first line which describes him as a "Jan. 6 Capitol riot organizer," (3) the related line that he "helped coordinate the Jan 6 Capitol insurrection, (4) the false description of him in a video climbing the Capitol steps, and (5) the use of a photo of him at a 2020 rally, which allegedly implies that Bostic spoke at Jan. 6. (Am. Compl., Dkt. 5, at 8). The Court will address each in turn.

a. Jan. 6 "Stop the Steal" Organizer

Bostic suggests that the title describing him as a "Jan. 6 'Stop the Steal' Organizer" was a false and malicious claim. (Am. Compl., Dkt. 5, at 4; Article, Dkt. 5-1, at 1). In full, the Article's title says, "Jan. 6 'Stop the Steal' organizer says he will be attending CPAC" with the subheading, "CPAC apparently doesn't have a problem with it." (Article, Dkt. 5-1, at 1).

The Court finds that this label is not defamatory. There is no dispute that Bostic was active in organizing "Stop the Steal." (Compl., Dkt. 1, at 5, Mot. Dismiss, Dkt. 9, at 2). He volunteered with Stop the Steal and attended at least one rally in 2020 related to the election. (Compl., Dkt. 1, at 6). As Bostic admits, he livestreamed the protest with the caption, "Storming the Capitol#StopTheSteal." (*Id.* at 7). And Stop the Steal itself does appear to have organized some of the events on January 6, even if Bostic alleges that it did not organize President Trump's speech that day. (*Id.* at 6). In short, because Bostic did attend a protest on January 6, which was at least partially planned by the group Stop the Steal which he had helped to organize, it was not defamatory to label him a "Jan. 6 'Stop the Steal' Organizer."

b. Climbing the Capitol Steps

Bostic also suggests that the Daily Dot Defendants falsely alleged that he climbed the Capitol steps. Here, the Article says, "'On Jan. 6, Bostic was in Washington with [Ali]Alexander. The two can be clearly identified in video clips climbing the Capitol steps with Alex Jones,' Salon reported in mid-January." (Article, Dkt. 5-1, at 3). Bostic argues that the Daily Dot Defendants "knew or disregarded that [he] did not climb the Capitol building steps with anyone on January 6, as confirmed by video and photographic evidence; however, they repeated the lie that he did so to falsely portray Mr. Bostic as a leader and coordinator of the protesters." (Am. Compl., Dkt. 5, at 3).

Here, the Court agrees with the Daily Dot Defendants that the description of him climbing the Capitol steps is not defamatory because the Article simply quotes from a previous Salon article.

(Article, Dkt. 5-1, at 3). Texas law immunizes newspapers and periodicals from libel when they accurately report allegations of a third party regarding a matter of public concern. Tex. Civ. Prac. & Rem. Code Ann. § 73.002, 73.005(b); *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019) (holding newspaper not liable for repeating third party allegations). The Article does not independently state that Bostic climbed the Capitol steps, and the following line explicitly limits the Daily Dot's own findings to Bostic "defend[ing] the Capitol riots, while he marched in Washington, D.C." (*Id.*). Because the Article does nothing more than repeat the third-party allegation, the Daily Dot Defendants cannot be held liable for the statement that he climbed the Capitol steps.

### c. The Article's Photo

Next, the Court turns to the Daily Dot's use of a photo of Bostic from a November 2020 rally. Here, Bostic alleges that the Daily Dot Defendants chose an image from a November 2020 rally in their article about January 6 "with the malicious intent of misleading their readers into believing that [Bostic] had addressed the crown on January 6, and had organized and coordinated riots and insurrection." (Am. Compl., Dkt. 5, at 8). The Daily Dot Defendants, meanwhile, argue that the "photo is a screenshot of a C-SPAN broadcast, and the chyron plainly shows that the year of that speech was 2020—the year before the 2021 riot." (Mot. Dismiss, Dkt. 9, at 18–19).

The Court agrees with the Daily Dot Defendants that the use of this photo is not defamatory. Nothing in the Article states that the photo depicts Bostic on January 6. The photo itself contains the "2020" year. The mere fact that the photo was taken in 2020 but is used to portray a person allegedly involved in the January 6, 2021, events does not render it defamatory because there are no labels or associated statements which describe the photo as one of Bostic on January 6. In other words, mere association of the photo with the Article's topic is not capable of supporting a defamatory inference. *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 633 (Tex. 2018) (holding that implied defamation must be reasonably capable of supporting the defamatory inference).

Moreover, while the photo may be used as evidence of the surviving defamation claim, the idea that he spoke at a crowd on January 6 would not be defamatory. Plainly, Bostic did broadcast his activities at the protest and Bostic does not allege damages related solely to being known for having attended (or speaking at) the protest. (Am. Compl., Dkt., at 6). While the photo may be used as evidence of the Daily Dot Defendants' malice, it itself is not actionable in defamation.

### d. Jan. 6 "Capitol Riot" Organizer and Insurrection Coordinator

Finally, Bostic's amended complaint alleges that the characterizations of him as a "Jan. 6 'Capitol Riot' organizer" and as someone who "helped coordinate" the "Jan. 6 Capitol insurrection" are false and defamatory. (Am. Compl., Dkt. 5, at 8). He states that the Daily Dot Defendants "made up these lies, inventing them out of whole cloth" to destroy his reputation. (*Id.*).

The Daily Dot Defendants argue that Bostic did in fact help to organize the events of January 6. (Mot. Dismiss, Dkt. 9, at 5). They point out that Stop the Steal's website directed visitors to a funding page for January 6 protestors and promoted a January 6 "Petition Congress" event. (*Id.*). In their request for judicial notice, they point to more sites and Tweets that associate Bostic with Stop the Steal. (Mot. Jud. Notice, Dkt. 10). Even assuming these sites were judicially noticeable, they would not warrant a dismissal. Indeed, the Daily Dot Defendants point out that Stop the Steal's website "[identified] Bostic as a Georgia organizer" but did not suggest a direct affiliation with organizing national or D.C. protests. (Mot. Dismiss, Dkt. 9, at 5). Nor do Bostic's tweets, which encourage his followers to come to D.C. on January 6, show that he "organized" the protest. (Mot. Jud. Notice, Dkt. 10). Tweets encouraging attendance at an event are not necessarily the same as "organizing" an event, and it would be premature to draw such an inference against Bostic.

There are reasons to doubt Bostic's characterization of the events. If Stop the Steal did help organize the portion of the January 6 protest that turned into the storming of the Capitol, that might show that the Article was not defamatory. But neither Bostic's complaint nor the Daily Dot

Defendants' motion explicitly describes Stop the Steal's role in the January 6 protests in detail. (*See* Mot. Dismiss, Dkt. 9, at 5–6 (discussing how Stop the Steal fundraised for January 6, but not what role it played in organizing the events)). Bostic alleges that "Stop the Steal [did not] organize[] President Trump's rally or the subsequent march to the Capitol lawn" but he stops short of disclaiming any organizational involvement. (Am. Compl., Dkt. 5, at 5). Elsewhere, he alleges that he "did not help Stop the Steal organize any events scheduled for January 5, 2021 or January 6, 2021 in Washington, D.C." (*Id.* at 6). But Bostic never describes what events Stop the Steal *did* plan for January 6. If Stop the Steal did organize events that led to the January 6 insurrection, and Bostic was listed as the media contact for Stop the Steal, such evidence will likely be relevant for summary judgment. However, as such information is not before the Court on the pleadings, dismissal is premature.

Further, the Daily Dot Defendants argue that their description of Bostic as an organizer and coordinator of the January 6 cannot be actionable in defamation because they are not provably false assertions of fact. (Mot. Dismiss, Dkt. 9, at 12). To make a claim for defamation, a plaintiff must show a statement that "expressly or impliedly asserts facts that can be objectively verified." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 509 (Tex. Ct. App.—Tyler 2008); *Jones v. Compass Bancshares Inc.*, 339 F. App'x 410 (5th Cir. 2009) (unpublished). The Daily Dot Defendants focus on the labels of the January 6 events as a "riot" or "insurrection." (Mot. Dismiss, Dkt. 9, at 12–14).

Whether this argument is correct or not, it appears to miss the thrust of Bostic's defamation claim. Bostic alleges that he attended a peaceful portion of the January 6 protest but left once it turned violent. As Bostic states, "Even if 'riot' and 'insurrection' could be interpreted to include the peaceful events of that day—and they cannot—Defendant's claims would *still* be false." (Pl.'s Resp., Dkt. 20, at 21) (emphasis in original). Whether Bostic organized or coordinated the January 6 insurrection does not depend on how that insurrection is classified. (*See* Am. Compl., Dkt. 5, at 9

("[T]he Article asserted that [Bostic] organized and coordinated riots and insurrection simply because [Bostic] had volunteered for another organization called Stop the Steal, which had not organized President Trump's rally or the subsequent march to the Capitol lawn.")). Accepting, for the purposes of a Rule 12 motion, that Bostic's factual claims are true, then the allegation that he was involved with organizing the January 6 riot or insurrection is plausibly defamatory, regardless of the potential meanings of the words.

Moreover, "riot" and "insurrection" do appear capable of containing a provably false assertion of fact. To be defamatory, statements must assert an objectively verifiable assertion of fact. *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 529 (W.D. Tex. 2021). Whether a statement is false and defamatory "depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (quoting *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)). Bostic's defamation claim is that he is described as "organiz[ing] the Jan. 6 Capitol riot" and "insurrection." (*Id.*). These words are not the sort of opinion or rhetorical hyperbole that courts have held lie outside the scope of defamation. *See, e.g., Coronado v. Freedom Communications, Inc.*, No. 13-13-00525-CV, 2015 WL 9434656 (Tex. App.— Corpus Christi–Edinburg Sept. 30, 2015, no pet.); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990) ("[A] statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection."). Instead, it is plausible that "riot" and "insurrection" refer to provable and specific facts and events. Namely, in this context, "riot" does not just characterize the protests, but refers to the violent events on near the Capitol steps and the storming of the Capitol building. The notion that the dictionary definitions of these terms could be used to describe broader behavior does not render them unverifiable in the context of the Article.

The Daily Dot Defendants also argue that the Article does not convey a defamatory meaning and that Bostic has not shown defamation by implication. (Mot. Dismiss, Dkt. 9, at 9). They argue that the Article "does not accuse Bostic of having organized, coordinated, or participated in the violence, attacks, illegal entry of the Capitol, or property damage perpetrated on January 6." (*Id.* (cleaned up)). They then state that such claims may only be met by inference, which Bostic has not met. (*Id.* at 9–10).

Eve assuming the Daily Dot Defendants were correct, their argument would not entitle them to dismissal. Bostic alleges that he was falsely accused of organizing and coordinating an insurrection. (Am. Compl., Dkt. 5, at 7–10). His amended complaint, taken as true at this stage, suggests that Stop the Steal had a limited role in the events of January 6. (*Id.* at 9). The Article then described Bostic as a "Jan. 6 Capitol riot organizer and 'Stop the Steal' leader . . . ." (Article, Dkt. 5-1-, at 1). If, as Bostic alleges, Stop the Steal did not organize the events of January 6, then he has shown that the Daily Dot published an article with a damaging falsehood. This is not "defamation by implication" as the Daily Dot Defendants characterize it. (Mot. Dismiss, Dkt. 9, at 6–7, 15–16). Labeling someone a "Jan. 6 Capitol riot organizer" states—not implies—that the person helped organize the Capitol riot. The higher showing required for defamation by implication is not necessary here. (*See id.* (citing *Dallas Morning News, Inc. v. Hall*, 579 S.W.3d 370, 380 (Tex. 2019)).

In sum, Bostic brings one claim for defamation which alleges several "false and defamatory statements." (Am. Compl., Dkt. 5, at 11–12). While most of these statements are not actionable in defamation, he has plausibly alleged that the descriptions of him as a riot organizer and insurrection coordinator were defamatory. Because these two statements survive and Bostic does not separate out the Article's independent statements in his count for defamation, the Court will deny the Daily Dot Defendants' motion to dismiss.

3.  Actual Malice

In addition, Bostic plausibly suggests that Petrizzo acted with sufficient malice to state a claim for defamation as a limited purpose public figure. "The actual malice inquiry focuses on the defendants' states of mind . . . which may be proved by indirect or circumstantial evidence." *Chevalier v. Animal Rehab. Ctr., Inc.*, 839 F. Supp. 1224 (N.D. Tex. 1993) (citing *Herbert v. Lando*, 441 U.S. 153, 170 (1979)). Bostic alleges that the evidence relied on by the Daily Dot Defendants in their Article should have alerted them to the falsity of their assertion that he organized the January 6 riot. (Am. Compl., Dkt. 5, at 9–12; Pl.'s Resp., Dkt. 20, at 31–32). Petrizzo's actions after publication of the Article also suggest—at this stage—that he acted with reckless or intentional disregard. Bostic alleges that Petrizzo "contacted organizers of CPAC" and "attempted to get [Bostic] banned from the event." (Am. Compl., Dkt. 5, at 9–10). He further alleges that Petrizzo "filmed [Bostic] entering a restroom." (*Id.* at 10). While this evidence may not speak to the Daily Dot Defendants' state of mind leading up to publication, it suggests that malice is at least plausible. It is rare that a plaintiff will be able to definitively assert what a defendant knew prior to publication—and that is not the standard at a motion to dismiss. At this stage, Bostic has shown more than "scant assertions" that the Daily Dot Defendants acted with malice. Drawing inferences in favor of Bostic, both Petrizzo's conduct and the nature of the Article's evidence plausibly suggest that the Daily Dot Defendants knew or recklessly disregarded the fact that Bostic did not organize the January 6 riot.

#### 4. Per Se Defamation

The Court also finds that, at this stage, Bostic has stated a plausible claim that the Article is per se defamatory. (*Id.* at 11–12). The Daily Dot Defendants only address the per se defamation claim in their reply brief, not their actual motion to dismiss. (*See* Mot. Dismiss, Dkt. 9; Defs.'s Reply, Dkt. 23, at 9). Because the Daily Dot Defendants do not move to dismiss the allegation on independent grounds, the Court will not dismiss the per se defamation claim.

#### 5. Tortious Interference

Finally, the Court addresses Bostic's claim for tortious interference with contract and prospective contract relations. Bostic alleges that, following publication of the Article, Petrizzo acted with malice because he "directly contacted the event's organizers to spread the lie that [Bostic] was a coordinator and organizer of January 6 riots and 'insurrection.'" (Am. Compl., Dkt. 5, at 13). The Daily Dot Defendants do not independently move to dismiss this claim. (*See* Mot. Dismiss, Dkt. 9). Instead, they note only that Bostic's tortious interference claim should be dismissed for the same reasons as his defamation claim. (*Id.*, at 12 n.9). Because Bostic's defamation claim survives in part, the Court will likewise allow his tortious interference claim to proceed.

### C. Request for Judicial Notice

Finally, the Court addresses the Daily Dot Defendant's motion for request for judicial notice. (Mot., Dkt. 10). As discussed *infra* Section III.B.2.b, Bostic has plausibly alleged that the description of him organizing the January 6 riot and coordinating the insurrection are defamatory. Bostic's tweets, Stop the Steal webpages, the Salon article, and his media interview do not alter this analysis. (*Id.*). While these documents may speak to Bostic's role in Stop the Steal, and Stop the Steal's role on January 6, they do not definitively show that Bostic organized or coordinated the January 6 riot or insurrection. Accordingly, it remains plausible that the Article's descriptions were defamatory. Because the documents would not change the Court's analysis, it need not issue rulings on the opposed request to take judicial notice. As a result, the Court will deny the motion as moot.

### IV. CONCLUSION

For these reasons, Clarion Media's motion to dismiss, (Dkt. 12), is **GRANTED**. Bostic's claim against Clarion Media is **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that the Daily Dot Defendants' motion to dismiss, (Dkt. 9), is **DENIED**.

**IT IS FURTHER ORDERED** that Daily Dot Defendants' motion for judicial notice, (Dkt. 10), is **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the remaining parties shall file their Rule 26(f) report and a proposed scheduling order no later than **March 31, 2023**.

**SIGNED** on March 1, 2023.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE